1

**THE WESTON FIRM**
GREGORY S. WESTON (239944)
*greg@westonfirm.com*
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone:   (619) 798-2006

2

3

4

5

**Counsel for Plaintiffs**

6

7

8

### UNITED STATES DISTRICT COURT

9

### FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12  | MICHAEL SMITH and JASON FERGUSON, and on behalf of themselves and all others similarly situated,

13

Case No:

Pleading Type: Class Action

14  | Plaintiffs,

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**

15  | v.

16  | ELEVADO DRINKS, LLC, CHACO FLACO DRINKS, LLC, HOP THE WAVE BREWING COMPANY and CHARLES MOORE,

**THE UNFAIR COMPETITION LAW AND THE CONSUMER LEGAL REMEDIES ACT AND FOR BREACH OF IMPLIED WARRANTY**

17

18  | Defendants.

**Jury Demand**

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.  JURISDICTION AND VENUE ...................................................................... 1

II.  NATURE OF THE ACTION .......................................................................... 1

III.  PARTIES ....................................................................................................... 7

IV.  NATURE OF THC AND CBD ....................................................................... 8

V.  REGULATORY BACKGROUND ................................................................ 10

VI.  THE SALE OF UNAPPROVED DRUGS POSES A GRAVE DANGER TO PUBLIC HEALTH ......................................................................................... 12

VII.  DEFENDANTS' DECEPTIVELY MARKET ELEVADO COCKTAILS AS "PERFECTLY MICRODOSED." ................................................................... 13

VIII.  ELEVADO COCKTAILS ARE AN ADULTERATED FOOD, RENDERING DEFENDANTS' MANUFACTURE AND SALE OF THE PRODUCTS ILLEGAL. ................. 14

IX.  ELEVADO COCKTAILS CONTAIN PHARMACEUTICAL DRUGS, RENDERING THEIR SALE UNLAWFUL. ..................................................... 16

X.  PLAINTIFFS' PURCHASES OF ELEVADO COCKTAILS ........................ 17

XI.  INJURY ....................................................................................................... 18

XII.  THE USE OF THC AND CBD IN ELEVADO COCKTAILS WAS UNFAIR ............................ 19

XIII.  DEFENDANTS' PRACTICES WERE "UNLAWFUL" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW ................................................................ 19

XIV.  CLASS ACTION ALLEGATIONS .............................................................. 22

XV.  PRAYER FOR RELIEF ............................................................................... 28

XVI.  JURY DEMAND ......................................................................................... 29

Plaintiffs Jason Ferguson and Michael Smith, on behalf of themselves, all others similarly situated, and the general public, by and through their undersigned counsel, hereby sue Defendants Elevado Drinks, LLC ("Elevado"), Chaco Flaco Drinks, LLC ("Chaco Flaco"), Hop the Wave Brewing Company, LLC ("HTW"), and Charles Moore (collectively "Defendants"), and upon information and belief and investigation of counsel, allege as follows:

## I.   JURISDICTION AND VENUE

1.    Jurisdiction is proper because Plaintiffs are citizens of California and because all claims are asserted under the laws of California and relate to a product that is sold in California and was purchased by Plaintiffs in California.

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff Michael Smith resides in this District and suffered injuries as a result of Defendants' conduct in this District; many of the acts and transactions giving rise to this action occurred in this District; and Defendants (1) are authorized to conduct business in this District, and have intentionally availed themselves of the laws and markets of this District through the distribution and sale of their products in this District, and (2) are subject to personal jurisdiction in this District.

## II.   NATURE OF THE ACTION

3.    Defendants manufacture, market, distribute, and sell a line of Elevado Sparkling Cocktails ("Elevado Cocktails") which contain tetrahydrocannabinol ("THC") and cannabidiol ("CBD"), psychoactive substances found in the cannabis plant. Defendants sell Elevado Cocktails in the following flavors: Strawberry Daiquiri, Prickly Pear Paloma, Berry Mojito, and Mango Margarita.

4.    The packaging of Elevado Cocktails is as follows:



CLASS ACTION COMPLAINT





CLASS ACTION COMPLAINT

1
2
3
4
5
6



7    5.    During the Class Period, Defendants sold Elevado Cocktails at retail locations throughout

California and the United States, such as Bevmo and Total Wine, at smoke shops, at marijuana

dispensaries, and online on their website, elevadodrinks.com. Below is a screenshot of the "Elevado

Cocktails" webpage from Defendants' website as it appeared on November 4, 2024:



6.    Below is a screenshot of the "Store Locator" webpage from Defendants' website as it appeared on November 4, 2024, indicating that Elevado Cocktails were available for purchase at multiple Bevmo locations in San Diego County:



7.      Below is a photograph of Elevado Cocktails on store shelves, which was taken at the Bevmo located at 3777 Willow Glen Dr., El Cajon, CA 92019 on September 10, 2024:



8.      There is no food additive regulation that authorizes the use of THC or CBD. THC and CBD are not the subject of a "prior sanction." 21 C.F.R. § 181.

9.      Further, there is not any basis to conclude that THC or CBD are generally recognized as safe ("GRAS") for use in conventional foods and beverages.

10.      The FDA's regulations in 21 C.F.R. § 170.30(a)-(c) describe the criteria for classification of a food ingredient as GRAS.

11.     The use of a food substance may be GRAS based on either scientific procedures or, for a substance used in food before 1958, through experience based on common use in food. 21 C.F.R. § 170.30.

12.     There is no basis for "general recognition of safety" for THC or CBD based either on scientific procedures or common use in food prior to January 1, 1958.

13.     For these reasons, THC and CBD are unsafe and unlawful food additives under both California and federal law.

14.     Further, Defendants deceptively market Elevado Cocktails as "perfectly microdosed" with THC and CBD.

15.     However, Elevado Cocktails are not "microdosed." Each Elevado Cocktail is "hemp infused" and contains 5 mg of THC and 5 mg of CBD:



16.     "Microdosing refers to the practice of consuming minimal quantities of a substance at regular times during the day. This approach is intended to unlock possible healing advantages while avoiding the usual mind-altering or adverse effects linked with that substance."[1]

17.     When microdosing THC, "a typical strategy is to commence with a daily dose of 2 mg of THC and gradually augment this by 1 mg each day. It's also a common practice to divide the total daily dosage into two parts – one for the morning and another for the evening." *Id.*

---

[1] Cannabis DoctorX, <u>Microdosing THC: What You Need to Know</u>, (February 20, 2024), available at https://cannadrx.com/microdosing-thc-what-you-need-to-know/.

18.    Though a typical microdose of THC consists of 1 mg-2.5 mg, Defendants' "perfectly microdosed" Elevado cocktails contain between two and five times the amount of THC as a typical "microdose."

19.    Thus, Elevado Cocktails are not "perfectly microdosed"—they are not microdosed at all.

20.    Consumers seeking to microdose THC purchased Elevado Cocktails in reliance on Defendants' "perfectly microdosed" representation suffered economic injury when they paid for a product that was (1) sold in violation of California and federal regulations and (2) was not "microdosed."

21.    Defendants' manufacture, distribution, and sale of Elevado Cocktails therefore violates federal and California law.

22.    Plaintiffs purchased Elevado Cocktails during the Class Period defined herein, for their personal consumption.

23.    This action is brought to remedy Defendants' unfair, deceptive, immoral, and unlawful conduct. On behalf of the class defined herein, Plaintiffs seek an order compelling Defendants to, *inter alia*: (1) cease marketing and selling Elevado Cocktails with deceptive and unlawful claims and ingredients; (2) conduct a corrective advertising campaign; (3) destroy all misleading and deceptive materials and products; (4) award Plaintiffs and the Class members damages, punitive damages, interest, and restitution; and (5) pay costs, expenses, and attorney fees.

## III.    **PARTIES**

24.    Defendant Elevado is an Arizona corporation with its principal place of business in Gilbert, Arizona. Elevado owns, markets, distributes, and sells Elevado Cocktails. Charles Moore, the CEO of Elevado, is also the CEO of Defendant Chaco Flaco.

25.    Defendant Chaco Flaco is an Arizona corporation with its principal place of business in Tempe, Arizona. Chaco Flaco owns, markets, distributes, and sells Elevado Cocktails. During the class period, Chaco Flaco owned the trademark for "Elevado Drinks."

26.    Defendant HTW is a Maine corporation with its principal place of business in Portland, ME. HTW manufactures, distributes, and sells Elevado Cocktails.

27.    Defendant Charles Moore is an individual residing in Arizona and is sued in his individual capacity. Moore is the CEO of Elevado and Chaco Flaco. At all relevant times, Moore has aided and

abetted the manufacturing, marketing, distribution, and sale of Elevado Cocktails. Moore controls Chaco Flaco and Elevado and created Elevado for the primary purpose of the illegal sale of drink products containing non-GRAS additives and undisclosed pharmaceutical drugs.

28.     Moore ordered, authorized, and participated in Defendants' unlawful sale of Elevado Cocktails.

29.     Further, Moore is directly involved in Elevado's marketing and product development.

30.     Plaintiff Michael Smith is a citizen of California and resident of Bakersfield who repeatedly purchased Berry Mojito Elevado Cocktails for personal consumption.

31.     Plaintiff Jason Ferguson is a is a citizen of California and resident of Santa Cruz who purchased Berry Mojito Elevado Cocktails for personal consumption.

## IV.    NATURE OF THC AND CBD

32.     THC is the primary psychoactive substance found in the cannabis plant.

33.     THC consumption can result in numerous adverse reactions.

34.     "THC can cause cognitive impairment and an altered mental state. Reported [adverse events] in clinical trials included amnesia, impaired balance, disturbed attention, dizziness, lethargy, and somnolence."[2]

35.     "THC has broad pharmacological action, adding up to a high potential for [adverse events] and [drug-drug interactions]." *Id.*

36.     "These ADEs and DDIs can be pharmacokinetic in nature, i.e., generated by drug effects on other drugs absorption, metabolism, or excretion, or pharmacodynamics, wherein drugs share a common mechanism or effect." *Id.*

37.     "THC has the potential for development of dependency and should be used in caution in individuals with previous or current substance use disorders, including those involving nicotine, alcohol, opioids, or other illicit drugs." *Id.*

38.     "THC's effects can be enhanced or limited by many other common medications, and THC

---

[2] Brown JD. *Potential Adverse Drug Events with Tetrahydrocannabinol (THC) Due to Drug-Drug Interactions*. J CLIN. MED. 2020 Mar 27;9(4):919. doi: 10.3390/jcm9040919. PMID: 32230864; PMCID: PMC7231229.

itself can increase toxicity of other medications by limiting their metabolic pathways." *Id.*

39.    THC consumption can affect "memory and cognitive function and cause harmful cardiovascular effects, such as high blood pressure."[3]

40.    Further, THC consumption "directly affects brain function—specifically the parts of the brain responsible for memory, learning, attention, decision making, coordination, emotions, and reaction time."[4]

41.    "Cannabis can make the heart beat faster and raise blood pressure immediately after use. It could also lead to increased risk of stroke, heart disease, and other vascular diseases." *Id.*

42.    "Cannabis use has been linked to social anxiety, depression, and schizophrenia." *Id.*

43.    "Edibles, or food and drink products infused with cannabis, have some different risks than smoked cannabis, including a greater risk of poisoning." *Id.*

44.    Frequent THC use "is linked to a higher risk of developing schizophrenia or other psychoses in people who are predisposed to these conditions."[5]

45.    CBD is the second most important psychoactive substance found in the cannabis plant.

46.    "During an April 11, 2024 hearing before the House Oversight and Accountability Committee, FDA Commissioner Califf stated 'the use of CBD raises safety concerns, especially with long-term use. Studies have shown evidence of liver toxicity, interactions with certain medications, and possible harm to the male reproductive system. CBD exposure is particularly concerning for children and during pregnancy.'"[6]

47.    "CBD can cause liver injury."[7]

---

[3] Mayo Clinic, Marijuana (Aug. 10, 2023), available at https://www.mayoclinic.org/drugs-supplements-marijuana/art-20364974.

[4] U.S. Center for Disease Control, Cannabis Health Effects, (February 16, 2024), available at https://www.cdc.gov/cannabis/health-effects/index.html.

[5] See Mayo Clinic, Marijuana (Cannabis, Weed) (Nov. 5, 2023), available at https://my.clevelandclinic.org/health/articles/4392-marijuana-cannabis.

[6] See Foley & Lardner LLP, FDA Continues to Take Stance that It Will Not Issue CBD Rules (April 24, 2024) available at https://www.foley.com/insights/publications/2024/04/fda-stance-not-issue-cbd-rules/.

[7] See U.S. Food & Drug Admin., What You Need to Know (And What We're Working to Find Out) About Products Containing Cannabis or Cannabis-derived Compounds, Including CBD (March 5, 2020),

48.    "CBD can affect how other drugs you are taking work, potentially causing serious side effects." *Id.*

49.    "Male reproductive toxicity, or damage to fertility in males or male offspring of females who have been exposed, has been reported in studies of animals exposed to CBD." *Id.*

### V.    REGULATORY BACKGROUND

50.    As defined in the Food, Drug & Cosmetics Act (21 U.S.C. § 321(s)), the term "food additive" refers to any substance the intended use of which results in it becoming a component of any food, unless the substance is generally recognized as safe ("GRAS") among qualified experts under the conditions of its intended use, or unless the substance meets a listed exception.

51.    Food additives require premarket FDA approval based on data demonstrating safety. Any food additive that has not been approved for its intended use in food is deemed to be unsafe under section 409(a) of the Act (21 U.S.C. 348(a)) and causes the food to be adulterated under 21 U.S.C. § 342(a)(2)(C)(i).

52.    Under 21 U.S.C. 331(ll),

it is prohibited to introduce or deliver for introduction into interstate commerce any food (including any animal food or feed) to which has been added a substance which is an active ingredient in a drug product that has been approved under section 505 of the FD&C Act [21 U.S.C. § 355], or a drug for which substantial clinical investigations have been instituted and for which the existence of such investigations has been made public. There are exceptions, including when the drug was marketed in food before the drug was approved or before the substantial clinical investigations involving the drug had been instituted or, in the case of animal feed, that the drug is a new animal drug approved for use in feed and used according to the approved labeling. However, based on available evidence, FDA has concluded that none of these is the case for THC or CBD. FDA has therefore concluded that it is a prohibited act to introduce or deliver for introduction into interstate commerce any food (including any animal food or feed) to which THC or CBD has been added.[8]

53.    Introduction of an adulterated food into interstate commerce is prohibited under 21 U.S.C. § 331(a).

---

available at https://www.fda.gov/consumers/consumer-updates/what-you-need-know-and-what-were-working-find-out-about-products-containing-cannabis-or-cannabis.

[8] See U.S. Food & Drug Admin., <u>FDA Regulation of Dietary Supplement & Conventional Food Products Containing Cannabis and Cannabis-Derived Compounds</u>, available at https://www.fda.gov/media/131878/download.

54.    There is no food additive regulation that authorizes the use of THC or CBD. THC and CBD are not the subject of a "prior sanction." 21 C.F.R. § 181.

55.    Furthermore, there is not any basis to conclude that THC or CBD are GRAS for use in conventional foods.

56.    The FDA's regulations in 21 C.F.R. § 170.30(a)-(c) describe the criteria for classification of a food ingredient as GRAS. The use of a food substance may be GRAS based on either scientific procedures or, for a substance used in food before 1958, through experience based on common use in food.

57.    There is no basis for general recognition of safety for THC or CBD based either on scientific procedures or common use in food prior to January 1, 1958.

58.    Based on a review of published scientific literature, existing data and information do not provide an adequate basis to conclude that the use of THC or CBD in food meets the criteria for GRAS status.

59.    Some of the available data raise serious concerns about potential harm from THC and CBD.

60.    The FDA has concluded that "CBD and THC cannot be added to foods under the FD&C Act regardless of whether the substances are hemp-derived."[9]

61.    It is

unlawful under the FD&C Act to introduce food containing added CBD or THC into interstate commerce, or to market CBD or THC products as, or in, dietary supplements, regardless of whether the substances are hemp-derived. This is because both CBD and THC are active ingredients in FDA-approved drugs and were the subject of substantial clinical investigations before they were marketed as foods or dietary supplements. Under the FD&C Act, it's illegal to introduce drug ingredients like these into the food supply, or to market them as dietary supplements.[10]

62.    This "is a requirement that" the FDA applies "across the board to food products that contain substances that are active ingredients in any drug." *Id.*

---

[9] See U.S. Food & Drug Admin., <u>FDA Role in Regulation of Cannabis Products</u>, available at https://www.fda.gov/media/128156/download.

[10] See U.S. Food & Drug Admin., <u>Statement from FDA Commissioner Scott Gottlieb, M.D., on signing of the Agriculture Improvement Act and the agency's regulation of products containing cannabis and cannabis-derived compounds</u> (December 20, 2018), available at https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-signing-agriculture-improvement-act-and-agencys.

63.     The

Dietary Supplement Health and Education Act (DSHEA) of 1994, which amended the Federal Food, Drug, and Cosmetic Act, transformed FDA's authority to regulate dietary supplements. Under DSHEA, FDA is not authorized to approve dietary supplements for safety and effectiveness before they are marketed. In fact, in many cases, firms can lawfully introduce dietary supplements to the market without even notifying FDA. Since DSHEA was enacted, the dietary supplement market has grown significantly. For example, the number of products has expanded nearly twenty times since 1994.[11]

64.     "The term 'drug' means . . . (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals." 21 U.S.C. § 321(g)(1).

65.     A "new drug" is any drug "not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the condition prescribed, recommended, or suggested in the labeling thereof . . ." 21 U.S.C. § 321(p)(1).

66.     Pursuant to 21 U.S.C § 355(a), "No person shall introduce or deliver for introduction into interstate commerce any new drug . . ." without approval by the FDA.

67.     Further, 21 U.S.C. § 331(a) prohibits the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded."

68.     Pursuant to 21 U.S.C. § 352(f), drugs are required to have adequate instructions for safe use.

## VI.     THE SALE OF UNAPPROVED DRUGS POSES A GRAVE DANGER TO PUBLIC HEALTH.

69.     Unapproved "drugs pose significant risks to patients because they have not been reviewed by FDA for safety, effectiveness or quality."[12]

---

[11] U.S. Food & Drug Admin., Information for Consumers on Using Dietary Supplements (October 21, 2022), available at https://www.fda.gov/food/dietary-supplements/information-consumers-using-dietary-supplements.

[12] U.S. Food & Drug Admin., Unapproved Drugs (June 2, 2021), available at https://www.fda.gov/drugs/enforcement-activities-fda/unapproved-drugs.

70.     "Without FDA review, there is no way to know if these drugs are safe and effective for their intended use, whether they are manufactured in a way that ensures consistent drug quality or whether their label is complete and accurate." *Id.*

71.     "Unapproved drugs have resulted in patient harm." *Id.*

72.     Further, unapproved drugs lack "labels and prescribing information that has" "been reviewed by FDA for accuracy and completeness."[13]

73.     Consumers using unapproved drugs also run the risk of "unexpected and undocumented safety concerns due to lack of rigorous pre- and postmarket safety surveillance." *Id.*

74.     Additionally, unapproved drugs lead consumers in need of medical treatment to forego medically proven therapies.

## VII.     DEFENDANTS' DECEPTIVELY MARKET ELEVADO COCKTAILS AS "PERFECTLY MICRODOSED."

75.     Defendants market Elevado Cocktails as "perfectly microdosed" with THC. Defendants further claim that "[e]ach can is microdosed with a balanced blend of THC and CBD, offering 5mg of THC and 5mg of CBD per serving. It's just enough for a smooth, enjoyable buzz that you can savor or stack to find your ideal dose." Moreover, Defendants claim that "Elevado THC cocktails are perfectly microdosed to deliver a light, balanced buzz. Think chill yet sociable, with vacay vibes in every sip. No hangovers, just good times."

76.     However, Elevado Cocktails are not "microdosed" at all. Each can of Elevado contains 5 mg of THC and 5 mg of CBD:

 

---

[13] U.S. Food & Drug Admin., Unapproved Drugs and Patient Harm (June 2, 2021), https://www.fda.gov/drugs/enforcement-activities-fda/unapproved-drugs-and-patient-harm.

77.    "Microdosing refers to the practice of consuming minimal quantities of a substance at regular times during the day. This approach is intended to unlock possible healing advantages while avoiding the usual mind-altering or adverse effects linked with that substance."[14]

78.    "The quantity needed for microdosing varies among individuals, but it's often initiated with a dosage range of 1 to 2.5 milligrams of THC." *Id.*

79.    Though a typical microdose of THC consists of 1 mg-2.5 mg, Defendants' "perfectly microdosed" Elevado cocktails contain between two and five times the amount of THC as a typical "microdose."

80.    In California, the maximum amount of THC permitted in a single serving of an edible product is 10 mg.[15]

81.    In states such as Connecticut, Vermont, and Virginia, the **maximum** amount of THC permitted in a single serving of an edible product is 5 mg—equivalent to the THC in Defendants' "perfectly microdosed" Elevado Cocktails. *Id.*

82.    Thus, Elevado Cocktails are not "perfectly microdosed"—they are not microdosed at all.

## VIII.    ELEVADO COCKTAILS ARE AN ADULTERATED FOOD, RENDERING DEFENDANTS' MANUFACTURE AND SALE OF THE PRODUCTS ILLEGAL.

83.    Elevado Cocktails contain THC and CBD.

84.    There is no food additive regulation that authorizes the use of THC or CBD. THC and CBD are not the subject of a "prior sanction" 21 C.F.R. § 181.

85.    Furthermore, there is no factual basis to support a later determination that THC or CBD are GRAS for use in conventional foods.

86.    The FDA's regulations in 21 C.F.R. § 170.30(a)-(c) describe the criteria for classification of a food ingredient as GRAS. The use of a food substance may be GRAS based on either scientific

---

[14] Cannabis DoctorX, <u>Microdosing THC: What You Need to Know</u>, (February 20, 2024), available at https://cannadrx.com/microdosing-thc-what-you-need-to-know/.

[15] The Network for Public Health, <u>THC Limits for Adult-Use Cannabis Products</u> (2022), available at https://www.networkforphl.org/wp-content/uploads/2022/11/THC-limits-for-Adult-Use-Cannabis-Products.pdf.

procedures or, for a substance used in food before 1958, through experience based on common use in food.

87.    There is no basis for general recognition of safety for THC or CBD based either on scientific procedures or common use in food prior to January 1, 1958.

88.    Published scientific literature and information do not provide an adequate basis to conclude that the use of THC or CBD in food meets the criteria for GRAS status.

89.    Some of the available literature raises serious concerns about potential harm from THC and CBD.

90.    Any food additive that has not been approved for its intended use in food is deemed to be unsafe under section 409(a) of the Act (21 U.S.C. 348(a)) and causes the food to be adulterated under 21 U.S.C. 342(a)(2)(C)(i).

91.    THC and CBD are unapproved food additives, rendering any food or beverage containing THC or CBD adulterated.

92.    The "FDA stated that it is 'unlawful under the [FFDCA] to introduce food containing added CBD or THC into interstate commerce, or to market CBD or THC products as, or in, dietary supplements, regardless of whether the substances are hemp-derived.' The agency has maintained this view in subsequent communications."[16]

93.    The FDA has repeatedly concluded that "CBD and THC cannot be added to foods under the FD&C Act regardless of whether the substances are hemp-derived."[17]

94.    Introduction of an adulterated food into interstate commerce is prohibited under 21 U.S.C. 331(a).

95.    Defendants' manufacture and sale of Elevado Cocktails thus violates the following sections of the FDCA:

[16] See Congressional Research Service, FDA Regulation of Cannabidiol (CBD) Consumer Products: Overview and Considerations for Congress (January 21, 2020), available at https://www.congress.gov/crs-product/R46189.

[17] See U.S. Food & Drug Admin., FDA Role in Regulation of Cannabis Products (February 2019), available at https://www.fda.gov/media/128156/download.

- 21 U.S.C. § 331(a) (prohibiting the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded");

- 21 U.S.C. § 331(b) (prohibiting the "adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce");

- 21 U.S.C. § 331(c) (prohibiting the "receipt in interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise");

- 21 U.S.C. § 348 (prohibiting the use of any food additive unless it has been deemed GRAS).

96.      Defendants' conduct further violates the California Sherman Food, Drug, and Cosmetic Law.

97.      Defendant's conduct also violates California's Health and Safety Code, which prohibits the manufacture, delivery, and sale of food that "contains any poisonous or deleterious substance that may render it injurious to health of man or any other animal that may consume it." *Id.* at § 110545.

## IX.    ELEVADO COCKTAILS CONTAIN PHARMACEUTICAL DRUGS, RENDERING THEIR SALE UNLAWFUL.

98.      Elevado cocktails contain THC and CBD.

99.      "THC (dronabinol) is the active ingredient in the approved drug products, Marinol capsules (and generics) and Syndros oral solution." [18]

100.      "Other than one prescription drug product to treat seizures associated with Lennox Gastaut syndrome (LGS), Dravet syndrome (DS), or tuberous sclerosis complex (TSC) in people one year of age and older, the U.S. Food and Drug Administration (FDA) has not approved any other CBD products, and there is very limited available information about CBD, including about its effects on the body."[19]

101.      The FDA further clarified the unlawful nature of CBD outside of its approved use:

During its review of the marketing application for Epidiolex — a purified form of CBD that the FDA approved in 2018 for use in the treatment of two rare and severe seizure disorders — the FDA identified certain safety risks, including the potential for liver injury. This serious risk can be

---

[18] See U.S. Food & Drug Admin., FDA Issues Response to Three Citizen Petitions Related to CBD and Dietary Supplements (January 26, 2023), available at https://www.fda.gov/food/hfp-constituent-updates/fda-issues-response-three-citizen-petitions-related-cbd-and-dietary-supplements.

[19] See U.S. Food & Drug Admin., What You Need to Know (And What We're Working to Find Out) About Products Containing Cannabis or Cannabis-derived Compounds, Including CBD (March 5, 2020), available at https://www.fda.gov/consumers/consumer-updates/what-you-need-know-and-what-were-working-find-out-about-products-containing-cannabis-or-cannabis.

managed when an FDA-approved CBD drug product is taken under medical supervision, but it is less clear how it might be managed when CBD is used far more widely, without medical supervision, and not in accordance with FDA-approved labeling. Although this risk was increased when taken with other drugs that impact the liver, signs of liver injury were seen also in patients not on those drugs. The occurrence of this liver injury was identified through blood tests, as is often the case with early problems with the liver. Liver injury was also seen in other studies of CBD in published literature. We are concerned about potential liver injury associated with CBD use that could go undetected if not monitored by a healthcare provider.

*Id.*

102.    It is unlawful under the FD&C Act to introduce food containing added CBD or THC into interstate commerce, or to market CBD or THC products as, or in, dietary supplements, regardless of whether the substances are hemp-derived. This is because both CBD and THC are active ingredients in FDA-approved drugs and were the subject of substantial clinical investigations before they were marketed as foods or dietary supplements. Under the FD&C Act, it's illegal to introduce drug ingredients like these into the food supply, or to market them as dietary supplements.[20]

103.    This "is a requirement that" the FDA applies "across the board to food products that contain substances that are active ingredients in any drug." *Id.*

104.    Because Elevado Cocktails contain THC and CBD, the active ingredients in approved drugs, the products are "drugs" pursuant to 21 U.S.C. § 321(g).

105.    Defendants have not received FDA approval to sell Elevado Cocktails.

106.    Pursuant to 21 U.S.C. § 355(a), "No person shall introduce or deliver for introduction into interstate commerce any new drug . . ." without approval by the FDA.

107.    Cal. Health & Safety Code § 111550 similarly prohibits the sale of unapproved drugs.

108.    Defendants' sale of Elevado Cocktails thus violates 21 U.S.C. § 355(a) and Cal. Health & Safety Code § 111550.

## X.    PLAINTIFFS' PURCHASES OF ELEVADO COCKTAILS

109.    Plaintiffs purchased and consumed Elevado Cocktails in California during the Class Period.

---

[20] See U.S. Food & Drug Admin., FDA Regulation of Dietary Supplement & Conventional Food Products Containing Cannabis and Cannabis-Derived Compounds, available at https://www.fda.gov/media/131878/download.

110.    Plaintiff Michael Smith purchased and consumed Berry Mojito Elevado Cocktails twice in California during the Class Period.

111.    Smith purchased Elevado Cocktails from a smoke shop in Los Angeles in 2023 and paid approximately $6 per purchase.

112.    Plaintiff Jason Ferguson purchased and consumed Berry Mojito Elevado Cocktails twice in California during the Class Period.

113.    Ferguson purchased Elevado Cocktails from a smoke shop in San Francisco in 2023 and 2024 and paid approximately $6 per purchase.

114.    Plaintiffs would not have purchased Elevado Cocktails had they known that they contained non-GRAS ingredients, were deceptively advertised, and were unlawful to sell.

## XI.    INJURY

115.    When purchasing Elevado Cocktails, Plaintiffs were seeking products that were not deceptively marketed and unlawfully sold and products containing only approved additives.

116.    Plaintiffs purchased Elevado Cocktails believing they had the qualities they sought based on the natural assumption that food sold in major retailers and regulated dispensaries would not have unsafe and unlawful ingredients.

117.    Instead, Elevado Cocktails were actually unsatisfactory to them for the reasons described herein.

118.    During the Class Period, Elevado Cocktails were not fit for human consumption and had a value of $0.

119.    Plaintiffs were unaware that Elevado Cocktails contained an unapproved food ingredient and undisclosed pharmaceutical ingredients when they purchased them and would not have purchased Elevado Cocktails had they known that the products contained food additives that are unlawful and undisclosed pharmaceutical drugs.

120.    Plaintiffs lost money as a result of Defendants' unlawful behavior. Plaintiffs altered their position to their detriment and suffered loss in an amount equal to the amount they paid for Elevado Cocktails.

## XII.    THE USE OF THC AND CBD IN ELEVADO COCKTAILS WAS UNFAIR

121.    During the Class Period, most manufacturers of competing beverage products responsibly decided to refrain from THC and CBD, non-GRAS food additives and unapproved drugs, to their products.

122.    In particular, while Defendants' use of THC and CBD in Elevado Cocktails and deceptive "microdose" claims may have some utility to Defendants in that they allow Defendants to realize higher profit margins than if they used only safe and approved ingredients, this utility is small and far outweighed by the gravity of the harm Defendants inflicted upon consumers.

123.    Defendants' conduct injured competing manufacturers of similar products that did not engage in their unfair practices, especially given the limited retail shelf space.

124.    Moreover, Defendants' practices violated public policy as declared by specific constitutional, statutory, or regulatory provisions, including the FDCA, the Food Additives Amendment of 1958.

125.    Further, the injury to consumers from Defendants' practices was substantial, not outweighed by benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided. Rather, the burden of avoiding dangerous and unapproved food additives is not reasonably placed on the general public, who have varied levels of education and familiarity with food safety, but rather on the manufacturers of food, both as a matter of equity and as a matter of efficiency.

126.    These unfair acts were also oppressive. Defendants knew THC and CBD cause adverse reactions and that most beverage companies did not use THC and CBD for these reasons. They nonetheless decided to place their desire for profit above the safety of their customers.

## XIII.    DEFENDANTS' PRACTICES WERE "UNLAWFUL" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW

127.    Defendants' practices as described herein are "unlawful" within the meaning of the California Unfair Competition Law because THC and CBD are not Generally Recognized as Safe (GRAS). Therefore, Defendants' use of THC and CBD rendered Elevado Cocktails adulterated within the meaning of 21 U.S.C. § 342(a)(2)(C).

128.    The THC and CBD used in Elevado Cocktails appear nowhere on the FDA's list of the hundreds of substances it considers GRAS.[21]

129.    THC and CBD also fail to meet the fundamental requirement for GRAS status—that the substance is safe for use in food. In fact, the FDA has explicitly recognized that THC and CBD not safe food additives.

130.    Under the Food Additives Amendment of 1958, which amended the FDCA, all food additives are by default considered unsafe unless they (1) fall within a specified exemption to the statute's definition of food additive, or (2) their use is pursuant to FDA approval. Because the THC and CBD used in Elevado Cocktails do not meet either of these exceptions, they are unsafe and unlawful for use in food.

131.    Defendants' use of THC and CBD in Elevado Cocktails thus constituted adulteration under 21 U.S.C. § 342.

132.    At no point during the class period was there a scientific consensus THC or CBD was safe.

133.    In using THC and CBD as food additives, Defendants failed to submit a food additive petition and failed to undertake a GRAS self-determination.

134.    Defendants' conduct was further "unlawful" because it violated the Federal Food, Drug and Cosmetic Act ("FDCA"), specifically,

- 21 U.S.C. § 331(a) (prohibiting the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded");
- 21 U.S.C. § 331(b) (prohibiting the "adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce");
- 21 U.S.C. § 331(c) (prohibiting the "receipt in interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise");
- 21 U.S.C. § 348 (prohibiting the use of any food additive unless it has been deemed GRAS).

135.    Further, "THC (dronabinol) is the active ingredient in the approved drug products, Marinol capsules (and generics) and Syndros oral solution."[22]

---

[21] See 21 C.F.R. §§ 181, 182, 184 and 186.

[22] See U.S. Food & Drug Admin., FDA Issues Response to Three Citizen Petitions Related to CBD and Dietary Supplements (Jan. 26, 2023), available at https://www.fda.gov/food/hfp-constituent-updates/fda-issues-response-three-citizen-petitions-related-cbd-and-dietary-supplements.

136.    "Other than one prescription drug product to treat seizures associated with Lennox Gastaut syndrome (LGS), Dravet syndrome (DS), or tuberous sclerosis complex (TSC) in people one year of age and older, the U.S. Food and Drug Administration (FDA) has not approved any other CBD products, and there is very limited available information about CBD, including about its effects on the body."[23]

137.    Because Elevado Cocktails contain THC and CBD, the active ingredients in approved drugs, the products are "drugs" pursuant to 21 U.S.C. § 321(g).

138.    Defendants have not received FDA approval to sell Elevado Cocktails.

139.    Pursuant to 21 U.S.C. § 355(a), "No person shall introduce or deliver for introduction into interstate commerce any new drug . . ." without approval by the FDA.

140.    Cal. Health & Safety Code § 111550 similarly prohibits the sale of unapproved drugs.

141.    Defendants' sale of Elevado Cocktails thus violates 21 U.S.C. § 355(a) and Cal. Health & Safety Code § 111550.

142.    Defendants' conduct further violated the California Sherman Food, Drug, and Cosmetic Law.

143.    Defendant's conduct also violates California's Health and Safety Code, which prohibits the manufacture, delivery, and sale of food that "contains any poisonous or deleterious substance that may render it injurious to health of man or any other animal that may consume it." *Id.* at § 110545.

144.    Defendants' conduct described herein also violates multiple provisions of California law including, *inter alia*:

- **Health & Safety Code § 110100 *et seq.***, which adopts all FDA labeling regulations as state regulations;
- **Health & Safety Code § 111330**, "Any drug or device is misbranded if its labeling is false or misleading in any particular.";
- **Health & Safety Code § 110398**, "It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.";
- **Health & Safety Code § 111440**, "It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any drug or device that is misbranded.";
- **Health & Safety Code § 111445**, "It is unlawful for any person to misbrand any drug or device.";

---

[23] See U.S. Food & Drug Admin., <u>What You Need to Know (And What We're Working to Find Out) About Products Containing Cannabis or Cannabis-derived Compounds, Including CBD</u> (March 5, 2020), available at https://www.fda.gov/consumers/consumer-updates/what-you-need-know-and-what-were-working-find-out-about-products-containing-cannabis-or-cannabis.

- **Health & Safety Code § 111450**, "It is unlawful for any person to receive in commerce any drug or device that is misbranded or to deliver or proffer for delivery any drug or device.";
- **Health & Safety Code § 111550**, prohibiting sale of new drugs unless approved under 21 U.S.C. § 355;
- **Civ. Code § 1770(a)**, prohibiting misleading practices in relation to the sale of goods;
- **Bus. & Prof. Code § 17500** *et seq.*, prohibiting false or misleading advertising;
- **Bus. & Prof. Code § 17200** *et seq.*, prohibiting fraudulent, unfair, and unlawful business activity.

145. The fraudulent marketing and advertising of Elevado Cocktails constitutes a violation of the FDCA and the Sherman Law, the CLRA, the FAL and, as such, violated the "unlawful" prong of the UCL.

146. Defendants' unlawful acts allowed them to sell more units of Elevado Cocktails than they would have otherwise, and at a higher price and higher margin.

147. In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiffs seeks an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign.

148. Plaintiffs also seek an order for the disgorgement and restitution of all revenue received by Defendants from the sale of Elevado Cocktails and have no adequate remedy at law.

## XIV.    CLASS ACTION ALLEGATIONS

149. Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class"), excluding Defendants' officers, directors, and employees, and the Court, its officers and their families. The Class is defined as:

All citizens of California who purchased Elevado Cocktails in California from May 14, 2021 to the present.

150. Questions of law and fact common to Plaintiffs and the Class include:

a. Whether Defendants communicated deceptive "microdose" messages through Elevado Cocktails' labeling, packaging, and website;

b. Whether those messages were material, or likely to be material, to a reasonable consumer;

c. Whether those messages were false, at variance with the truth, misleading, likely to deceive, and/or had the capacity to deceive the public and/or a reasonable consumer;

d. Whether Defendants' advertising for Elevado Cocktails violated the CLRA and False Advertising Law;

e. Whether Defendants' conduct constituted a violation of the unfair prong of

California's Unfair Competition Law;

f.  Whether Defendants' conduct constituted a violation of the unlawful prong of California's Unfair Competition Law;

g.  Whether Defendants' conduct constituted a violation of the fraudulent prong of California's Unfair Competition Law;

h.  Whether Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers;

i.  Whether the slight utility Defendants realized as a result of their conduct outweighs the gravity of the harm the conduct caused to their victims;

j.  Whether Defendants' conduct violated public policy as declared by specific constitutional, statutory, or regulatory provisions;

k.  Whether the injury to consumers from Defendants' practices is substantial;

l.  Whether the injury to consumers from Defendants' practices is outweighed by benefits to consumers or competition;

m.  Whether Class members are entitled to restitution and/or damages;

n.  Whether Class members are entitled to an injunction and, if so, its terms; and

o.  Whether Class members are entitled to any further relief.

151.  By purchasing Elevado Cocktails, all Class members were subjected to the same wrongful conduct.

152.  Plaintiffs' claims are typical of the Class's claims because all Class members were subjected to the same economic harm when they purchased Elevado Cocktails and suffered economic injury.

153.  Plaintiffs will fairly and adequately protect the interests of the Class, have no interests that are incompatible with the interests of the Class, and have retained counsel competent and experienced in class litigation.

154.  The Class is sufficiently numerous, as it includes thousands of individuals who purchased Elevado Cocktails in California during the Class Period.

155.  Class representation is superior to other options for the resolution of the controversy. The relief sought for each Class member is small, as little as $6 for some Class members. Absent the availability of class action procedures, it would be infeasible for Class members to redress the wrongs done to them.

156.    Questions of law and fact common to the Class predominate over any questions affecting only individual members.

### First Cause of Action

**Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.***

**Unfair Prong**

157.    In this and every cause of action, Plaintiffs reallege and incorporate by reference each and every allegation contained elsewhere in the Complaint, as if fully set forth herein.

158.    The business practices and omissions of Defendants as alleged herein constitute "unfair" business acts and practices in that Defendants' conduct is immoral, unethical, unscrupulous, and substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to Defendant's victims.

159.    Further, Defendants' practices were unfair because they violated public policy as declared by specific constitutional, statutory, or regulatory provisions, including those embodied in the FDCA and California Health and Safety Code.

160.    Moreover, Defendants' practices were unfair because the injury to consumers from Defendants' practices was substantial, not outweighed by benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided or should be obligated to avoid.

### Second Cause of Action

**Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.***

**Unlawful Prong**

161.    In this and every cause of action, Plaintiffs reallege and incorporate by reference each and every allegation contained elsewhere in the Complaint, as if fully set forth herein.

162.    Defendants have made and distributed, in interstate commerce and in this District, products that contained unlawful food additives and undisclosed pharmaceutical drugs. Elevado Cocktails were placed into interstate commerce by Defendants.

163.    Defendants' conduct was "unlawful" because it violated the Federal Food, Drug, and Cosmetic Act ("FDCA"), specifically, the Food Additives Amendment of 1958, which deems a food

additive unsafe unless it has met two exceptions, neither of which the PHO used in Elevado Cocktails products has met. 21 U.S.C. §§ 348, 342.

164.    Defendants' conduct violated California's Sherman Law, because Elevado Cocktails contained THC and CBD, which are "poisonous or deleterious substance[s] that may render" them "injurious to health of man or any other animal that may consume it." Health & Safety Code § 110545.

165.    Defendants' conduct is further unlawful because Elevado Cocktails contain THC, the active ingredient in approved drugs, and Defendants have not obtained FDA approval to sell Elevado Cocktails.

166.    Defendants' conduct violated the following portions of the Federal Food, Drug, and Cosmetic Act ("FDCA"):

- **21 U.S.C. § 331(a)**, prohibiting the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded";
- **21 U.S.C. § 331(b)**, prohibiting the "adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce";
- **21 U.S.C. § 352(f)(1)**, requiring drugs to have adequate directions for use;
- **21 U.S.C. § 355(a)**, prohibiting the sale of unapproved new drugs; and

167.    Defendants' conduct also violates other provisions of California law including, *inter alia:*

- **Cal. Health & Safety Code § 110100 *et seq.***, which adopts all FDA regulations as state regulations;
- **Cal. Health & Safety Code § 110398**, "It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.";
- **Cal. Health & Safety Code § 111440**, "It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any drug or device that is misbranded.";
- **Cal. Health & Safety Code § 111550**, prohibiting sale of new drug unless approved under 21 U.S.C. § 355.

168.    The use of THC and CBD in Elevado Cocktails thus constituted violations of the FDCA and the Sherman Law and, as such, violated the "unlawful prong" of the UCL.

169.    Plaintiffs suffered injury in fact and lost money or property as a result of Defendants' unlawful acts: they were denied the benefit of the bargain when they decided to purchase Elevado Cocktails over competing products that were less expensive and/or contained no THC and CBD.

170.    Had Plaintiffs been aware of Defendants' unlawful conduct, they would not have purchased Elevado Cocktails.

171.    Defendants' unlawful acts allowed it to sell more units of Elevado Cocktails than it would have otherwise, and at a higher price, and higher margin.

172.    Plaintiffs seek an order for the disgorgement and restitution of all revenue received by Defendants from the sale of Elevado Cocktails and have no adequate remedy at law

**Third Cause of Action**

**Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.***

**Fraudulent Prong**

173.    In this and every cause of action, Plaintiffs reallege and incorporate by reference each and every allegation contained elsewhere in the Complaint, as if fully set forth herein.

174.    Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

175.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants as alleged herein constitute "fraudulent" business acts and practices in that Defendants' conduct has a likelihood, capacity or tendency to deceive Plaintiffs, the Class, and the general public.

176.    Defendants leveraged their deception to induce Plaintiffs and members of the Class to purchase products that were of lesser value and quality than advertised.

177.    Had Plaintiffs been aware of Defendants' misleading advertising, they would not have purchased Elevado Cocktails.

178.    In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and fraudulent acts and practices, requiring Defendants to commence a corrective advertising campaign, and awarding the class restitution of all monies Defendants obtained from the sale of Elevado Cocktails. Plaintiffs have no adequate remedy at law.

**Fourth Cause of Action**

**Breach of Implied Warranty of Merchantability**

179.    Plaintiffs reallege and incorporate by reference each and every allegation contained elsewhere in the Complaint, as if fully set forth herein.

180.    Defendants, through their acts and omissions set forth herein, in the sale, marketing and promotion of Elevado Cocktails, made representations to Plaintiffs and the Class that Elevado Cocktails is safe to consume.

181.    Plaintiffs and the Class bought Elevado Cocktails manufactured, advertised, and sold by Defendants, as described herein.

182.    Defendants are merchants with respect to the goods of this kind which were sold to Plaintiffs and the Class, and there was in the sale to Plaintiffs and other members of the Class an implied warranty that those goods were merchantable.

183.    Defendants breached that implied warranty, however, in that Elevado Cocktails were not fit for their ordinary purpose in that they were not safe, wholesome, and legal food products.

184.    During the Class Period, Elevado Cocktails were not fit for human consumption and had a value of $0.

185.    As an actual and proximate result of Defendants' conduct, Plaintiffs and the Class did not receive goods as impliedly warranted by Defendants to be merchantable in that Elevado Cocktails were not fit for their ordinary purpose of human consumption.

186.    Plaintiffs and the Class have sustained damages as a proximate result of the foregoing breach of implied warranty in the amount of Elevado Cocktails' purchase price.

## Fifth Cause of Action

### Consumer Legal Remedies Act

### Civil Code §§ 1750, *et seq.*

187.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

188.    Defendants' policies, acts and practices were designed to, and did, result in the purchase and use of Elevado Cocktails for personal, family, or household purposes, and violated and continue to violate the following sections of the CLRA:

- Civil Code § 1770(a)(5), representing that goods have characteristics, uses, or benefits which they do not have;
- Civil Code § 1770(a)(7), representing that goods are of a particular standard, quality, or grade if they are of another;
- Civil Code § 1770(a)(9), advertising goods with intent not to sell them as advertised; and

- Civil Code § 1770(a)(16), representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

189.    As a result, Plaintiffs, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendants were unjustly enriched.

190.    As a further result, Plaintiffs and the Class have suffered damages, and because the conduct was deliberate, immoral, oppressive, made with malice and contrary to public policy, they are entitled to punitive or exemplary damages.

191.    Pursuant to section 1782 et seq. of the CLRA, Plaintiffs notified Defendants in writing by certified mail of the particular violations of § 1770 of the Act as to Elevado Cocktails and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to so act.

192.    Defendants received Plaintiffs' written notice.

## XV.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for judgment against Defendants as follows:

a) An order confirming that this class action is properly maintainable as a class action as defined above, appointing Plaintiffs Jason Ferguson and Michael Smith and their undersigned counsel to represent the Class, and requiring Defendants to bear the cost of class notice;

b) An order requiring Defendants pay $500 in restitution, damages, and interest to each named Plaintiff;

c) An order requiring Defendants to pay $5 million or a greater amount to be proven at trial in restitution to Class members, and $10,000 to each named Plaintiff as an incentive award, or such greater amount the Court deems fair and reasonable;

d) An order requiring Defendants to disgorge any benefits received from Plaintiffs and the Class and their unjust enrichment realized as a result of their improper and misleading advertising, marketing, sale, and distribution of Elevado Cocktails;

e) An order awarding Plaintiffs and the Class damages and punitive damages;

f) An Order declaring the conduct complained of herein violates the Unfair Competition Law;

g) An order requiring Defendants to cease and desist their deceptive, unconscionable, fraudulent, and unlawful practices;

h) An order requiring Defendants to engage in a corrective advertising campaign;

i)   An award of prejudgment and post judgment interest;

j)   An award of attorney fees and costs of $500,000, or such greater amount as the Court awards as fair and reasonable; and

k)   Such other and further relief as this Court may deem just, equitable or proper.

**XVI.    JURY DEMAND**

Plaintiffs demand a jury trial.

DATED: May 14, 2025                          Respectfully Submitted,


                                             s/ Gregory S. Weston
                                             **THE WESTON FIRM**
                                             GREGORY S. WESTON

                                             **Counsel for Plaintiffs**